[PUBLISH]

# In the
# United States Court of Appeals
# For the Eleventh Circuit

_____

No. 22-12148

_____

UNITED STATES OF AMERICA,

                                                                      Plaintiff-Appellee,

*versus*

QUINTON JAROD SIMMONS,

                                                                       Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 7:19-cr-00025-WLS-TQL-1

_____

Before BRANCH, GRANT, Circuit Judges, and CALVERT,[*] District Judge.

GRANT, Circuit Judge:

District courts have broad discretion over the management of trials. This authority springs from rules and statutes, of course, but also from the inherent powers necessary to ensure the just and expeditious resolution of cases.

Here, a criminal defendant challenges the district court's decision in an area not covered by a specific rule—whether to allow the defense to play video clips for the first time during closing argument. We can see why the court said no. Had it allowed this last-minute maneuver, the new video clips would have come in with no explanation from any witness and no opportunity for a government witness to testify about them—even though the defendant himself had argued they were not authenticated. Under these circumstances, the district court did not abuse its broad discretion to control the scope of closing arguments.

The defendant also raises a *Batson* challenge, but failed to make a prima facie showing below that the government struck jurors based on their race. What's more, we see no error in the district court's acceptance of the unrebutted, race-neutral justifications offered for each strike. We therefore affirm.

---

[*] The Honorable Victoria M. Calvert, United States District Judge for the Northern District of Georgia, sitting by designation.

**I.**

One night on patrol, Officer Devosie Jones of the City of Remerton Police Department saw a black Cadillac with only one headlight shining. He initiated a traffic stop, turning on his lights, and adding sirens when the Cadillac refused to slow down. Eventually, Officer Jones reached a speed of between sixty and seventy miles per hour (the speed limit was thirty-five). Just as his supervisor, Corporal Elvoid Hunter, was calling off the pursuit, the Cadillac crashed into a tree.

Jones approached the wreckage and saw Quinton Simmons trying (unsuccessfully) to climb out of the passenger side of the car; the door frame had been dented in the collision. Jones, with help from another officer who had arrived as backup, extracted Simmons from the badly damaged vehicle. When Corporal Hunter arrived eight to ten minutes later, he and Jones worked together to open the car doors. They found two bags of suspected narcotics and a firearm.

Simmons was charged with (1) possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); (2) possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (3) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). He pleaded not guilty to each count.

A twelve-person jury was empaneled from a venire of about fifty prospective jurors. Simmons raised a *Batson* challenge before

trial, arguing that the government's peremptory strikes against three black jurors were impermissibly motivated by race. But the district court denied the challenge, crediting the government's explanations for the strikes as genuine and race-neutral. The case proceeded to trial.

During its case-in-chief, the government called Corporal Hunter to the stand. He was asked to identify the government's Exhibit 11, which he recognized as a body camera video from one of the police officers who had arrived on the scene before he did. Simmons objected to the admission of the exhibit because Hunter could not authenticate the first part of the video, which was recorded before he arrived. The government responded that it only intended to play clips from after Hunter had arrived on the scene. Emphasizing the government's assertion that the government was "only going to play the part that this witness observed and can verify," the court allowed the video to be introduced "with that understanding."

The government then played a twenty-seven-second clip to show the scene of the accident, with Simmons seated on the ground on the passenger side of the damaged Cadillac. No other part of Exhibit 11 was played during the presentation of evidence—by either side. The government then played a small portion of Corporal Hunter's own body camera footage, the government's Exhibit 4. When Simmons sought to play all of government's Exhibit 4, the government objected, arguing that certain parts of it were inadmissible. The district court overruled this objection

because the entire exhibit was admitted. In that video record, about forty minutes after Hunter arrived on the scene, Simmons can be heard asking whether the officers had been able to "catch the other dude," to which Hunter replied: "what other dude?" Simmons did not elaborate in response.

When it was Simmons's turn to present evidence, the theory he presented to the jury was that he had been kidnapped by a gang member who then crashed the Cadillac. This person, Simmons claimed, managed to flee from the site of the wreck undetected in the seconds before Officer Jones—who had been in hot pursuit—arrived at the scene. And, according to Simmons, the assailant left his gun and drugs behind when he fled, pinning the evidence on Simmons.

Simmons first attempted to support this theory with the testimony of James Daniels, who said that on the night of the accident he was staying with his grandmother a few miles away from Simmons's crash. Daniels called 9-1-1 that night to report that his grandmother had heard someone run through the backyard and asked him to investigate. According to Simmons, this evidence corroborated his story that the real driver fled on foot from the scene.

Simmons's second witness was Melvin Higgins—a felon who had served time in the same facility as Simmons. Higgins testified that on the night of the accident his brother called to say that he had crashed a car and then fled the scene, leaving "a Glock and some pills inside." Higgins added that his brother, now

deceased, had been the head of the Crips gang in Georgia before his death, and had asked him to warn Simmons not to "snitch." Higgins also testified that his brother was 5'9" but weighed at least 230 pounds—making it less likely that he could have fled quickly enough to escape notice of the officer who arrived seconds after the crash. Simmons declined to testify on his own behalf, and the defense rested its case.

On rebuttal, the government called two more witnesses. First was a university professor who lived two doors down from the site of the accident. She recalled running outside immediately when she heard the crash, but saw no one fleeing from the scene. Next was the administrator for the county jail, who authenticated audio recordings in which the government said Simmons coached his sister about how to support his story.

After the prosecution gave its closing remarks, it was Simmons's turn. His counsel gave a few introductory remarks, and then attempted to play several new clips from the government's Exhibit 11, one of the body camera videos. The government immediately objected, and an impromptu bench conference followed. The government argued that the clips could not be played in closing because they had never been published to the jury during the trial. Simmons, on the other hand, insisted that he could play the clips because they came from the government's exhibit, the whole of which had been admitted into evidence.

The district court agreed with the government. "What was played before the jury can be played," it explained, with the jury

able to ask for more of the exhibit if it wished. But Simmons could not expand the evidence during closing by calling the jury's attention to video clips that had not been presented during the evidence phase of the trial. With that, the bench conference concluded, and counsel for Simmons returned to his planned remarks. But not for long—almost immediately, he urged the jury to watch the entire exhibit during deliberation. The court cut him off and instructed the jury to disregard that invitation. The court explained that after it admitted the video, Simmons could have played whatever clips he wanted during the evidence stage of the trial; that opportunity, however, did not extend indefinitely, and certainly not past the close of evidence.

While the jury deliberated, Simmons attempted to build a record for appeal, explaining to the court why the video clips were important. In the first clip, an officer told Simmons that there was no one else in the car in response to an unintelligible comment from Simmons. In the second, Simmons asked Corporal Hunter if he knew whether they "caught that other person," and Hunter responded that he did not know. And in the third, Simmons said, radio traffic mentioning Daniels's 9-1-1 call demonstrated the proximity in time between that call and the crash. All of this evidence, according to Simmons, would have corroborated his story that he was first kidnapped and then framed by a Crips leader.

After less than twenty minutes of deliberation, the jury found Simmons guilty on each count of the indictment. This is his appeal.

## II.

We review restrictions on closing arguments for abuse of discretion. *See United States v. Harris*, 916 F.3d 948, 954 (11th Cir. 2019). Absent such a showing, "the district court will not be reversed for limiting summation as long as the defendant has the opportunity to make all legally tenable arguments that are supported by the facts of the case." *Id.* (quotation omitted).

We review jury selection under *Batson* de novo, but a trial court's factual findings in a *Batson* hearing are reviewed for clear error. *United States v. Lewis*, 40 F.4th 1229, 1242 n.8 (11th Cir. 2022).

## III.

It has "universally been held that counsel for the defense has a right to make a closing summation to the jury." *Herring v. New York*, 422 U.S. 853, 858 (1975). After all, that is "the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *Id.* at 862.

But the solemnity of this right does not mean that closing arguments must be "uncontrolled" or "unrestrained." *Id.* To the contrary, the district court has "broad discretion" and "great latitude," in "limiting the scope of closing summations," and can "ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." *Id.* So long as the court allows a defendant to offer "the essence of his desired argument to the jury, his right to present a complete defense has not been prejudiced." *Harris*, 916 F.3d at 959.

Here, the district court did not abuse its discretion when it stopped Simmons from showing the new video clips during his closing argument. To start, Simmons had every opportunity to publish those parts of Exhibit 11 to the jury during the presentation of evidence, but chose not to do so. As the district court explained, the government's decision to play only a brief segment of the exhibit during its case-in-chief in no way limited Simmons's ability to play the entire video before the jury earlier in the trial. Indeed, Simmons chose to play all of government's Exhibit 4 during his cross-examination of Hunter.

What's more, no witness ever authenticated the opening of that footage. *See* 2 Robert P. Mosteller et al., *McCormick on Evidence* § 216 (8th ed. July 2022 update). And at least part of the video that Simmons tried to play was from the part of the tape that he had argued could not be authenticated by Hunter. We can understand why the court did not want to walk into that authentication problem during closing arguments.

Similarly, allowing Simmons to play these clips for the first time during closing would have offered no opportunity for the government to examine a witness about the video, or show further excerpts that would put it in proper context. Cross-examination is "an essential safeguard of the accuracy and completeness of testimony," that is regarded by many judges and lawyers as "a right, not a mere privilege." 1 Mosteller et al., *supra*, § 19 (footnote omitted). But if a video is shown for the first time during closing argument, there is no witness to examine or cross-examine and no

way for opposing counsel to challenge the other side's explanation. *See Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1128–29 (10th Cir. 2009) (Gorsuch, J.); Jacob Stein, *Closing Arguments*, § 1:14 (2d ed. 2005).

Simmons relies on the fact that the entire exhibit had already been admitted into evidence, but that does not move the needle. The district court was operating well within its discretion here when it concluded that Simmons was trying to introduce new evidence rather than summarize and argue from evidence the jury had already heard. *See United States v. Al Jaberi*, 97 F.4th 1310, 1328 (11th Cir. 2024); *United States v. Klebig,* 600 F.3d 700, 718 (7th Cir. 2009); 1 Mosteller et al., *supra*, § 4. Though the lengthy body camera video (ninety minutes) had been admitted into evidence as a technical matter, only a small portion (twenty-seven seconds) had been published to the jury. Simmons could have chosen to present other clips from the video, as he did with government's Exhibit 4, but for whatever reason—an unfortunate oversight, an attempt to gain an advantage, or something else—did not. He has not offered any justification for this failure, either here or at the district court, and we see no reason that the district court needed to excuse it by effectively allowing new evidence to be presented so late in the game.

Simmons next argues that he should have been allowed to play the remaining portions of the video under the rule of completeness. The problem with this argument is that the portion of government's Exhibit 11 that the government played did not

include any statements by Simmons; thus, there was nothing to complete. *See United States v. Ramirez-Perez*, 166 F.3d 1106, 1112–13 (11th Cir. 1999). And even if the rule of completeness did apply, Simmons fails to explain why he could not have played more of government's Exhibit 11 before his closing argument.

We note that even with this very reasonable limitation on Simmons's closing argument, he was able to make "the essence of his desired argument." *Harris*, 916 F.3d at 959. Simmons's counsel explained his theory that Simmons had been kidnapped on the night of the wreck. He recounted Higgins's testimony to that effect; he replayed Mr. Daniels's phone call to 9-1-1; he reminded the jury that Simmons had asked Corporal Hunter at the scene about "the other dude"; and he tried to minimize the testimony from the neighbor who did not see another suspect flee the scene on foot. Even if the unplayed portions of the video would have arguably corroborated those same arguments, forbidding them did not prejudice Simmons's "right to present a complete defense." *Id.*

In sum, the district court did not abuse its discretion by preventing Simmons's counsel from showing previously unpublished video evidence during his closing argument. Though there is no explicit rule about such matters, our conclusion respects "that a district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Dietz v. Bouldin*, 579 U.S. 40, 45

12               Opinion of the Court                22-12148

(2016) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)).

## IV.

Simmons also challenges his conviction on the ground that the government improperly struck jurors on the basis of race. He lacks evidence of such discrimination, however, so we conclude that the district court did not err in rejecting his *Batson* challenge.

In its landmark decision *Batson v. Kentucky*, the Supreme Court held that the Equal Protection Clause prohibits the prosecution from peremptorily striking jurors on account of race. 476 U.S. 79, 89 (1986). *Batson* and its progeny established a three-part, burden-shifting test for evaluating whether a peremptory strike violates the Constitution. *See United States v. Folk*, 754 F.3d 905, 912 (11th Cir. 2014). *First*, "a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race." *Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003). *Second*, "if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question." *Id.* *Third*, "in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Id.* at 328–29.

The first step is crucial. This Court has explained that a prima facie case "must be established before there is any further inquiry into the motives for the challenged strikes." *United States v. Walker*, 490 F.3d 1282, 1291 (11th Cir. 2007). To make out a prima facie case, the moving party "is required to present evidence

other than the bare fact of a juror's removal." *Id.* Sometimes a pattern will be enough. *Id.* Other relevant evidence can include "statistical evidence"; "evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors"; "side-by-side comparisons" of black and white prospective jurors who were struck and not struck; any misrepresentations by the prosecutor "when defending the strikes during the *Batson* hearing"; "relevant history of the State's peremptory strikes in past cases"; or any "other relevant circumstances." *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019).

Simmons offered none of this. He instead argued that the government used the majority of its strikes on black jurors, even though they were only a small minority of the venire panel. The problem with Simmons's argument is that the record does not reflect this. We have no information on the racial makeup of the panel, which means we have insufficient evidence to conclude, as Simmons alleges, that only a small minority of the original panel of potential jurors were black.

Though Simmons failed to offer a prima facie case of a *Batson* violation, the government (helpfully) tendered nondiscriminatory reasons for each strike anyway. The district court did not clearly err in crediting the sincerity of those explanations. Juror 33, the government said, was "disingenuous and not forthcoming." When asked whether he had been arrested in the past, for example, Juror 33 stated that he had a DUI charge that was reduced to reckless driving, received stolen property once

over twenty years ago, and discharged a firearm in the late 1990s. Only when he was specifically asked did he admit to also having multiple charges for theft by shoplifting, plus several other DUIs. On top of that, the juror revealed in his initial questionnaire that "he felt that he could not sit in judgment of another person."

The government next explained that it struck Juror 45 because counsel believed that the juror's business was under criminal investigation. Though it later became clear that there had been a mix-up between the juror's business and another business with the same name, the government did not know that when it exercised the strike. Finally, the government said it struck Juror 55 for three reasons: her place of employment was a "very liberal establishment"; she received her news from CNN and YouTube; and her husband was a jailer at a notoriously corrupt jail.

Simmons did not show that any of the government's proffered explanations were pretextual. Moreover, the district court's step-three determination that the government lacked discriminatory intent is entitled to a high degree of deference. *See Vinson v. Koch Foods of Alabama, LLC*, 12 F.4th 1270, 1275–76 (11th Cir. 2021). Because nothing in the record suggests that the trial court clearly erred in crediting the government's explanations for the challenges, we affirm the denial of Simmons's *Batson* challenge.

★ ★ ★

The district court did not abuse its broad discretion over the scope of closing argument. Nor did it err in denying Simmons's

22-12148               Opinion of the Court                        15

*Batson* challenge. Because we find no error, the judgment is **AFFIRMED**.